**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| DONALD DEHART, | : | Case No. 3:15-cv-446 |
| | : | |
| Plaintiff, | : | District Judge Walter H. Rice |
| | : | Chief Magistrate Judge Sharon L. Ovington |
| vs. | : | |
| | : | |
| CAROLYN W. COLVIN, | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

---

## REPORT AND RECOMMENDATIONS[1]

---

## I.    Introduction

Plaintiff Donald Dehart brings this case challenging the Social Security Administration's denial of his application for a period of disability and Disability Insurance Benefits.  He applied for benefits on April 26, 2012, asserting that he could no longer work a substantial paid job due to emphysema, chronic obstructive pulmonary disease (COPD), and shortness of breath.  Administrative Law Judge (ALJ) Elizabeth A. Motta concluded that he was not eligible for benefits because he was not under a "disability" as defined in the Social Security Act.

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #10), Plaintiff's Reply (Doc. #11), the administrative record (Doc. #6), and the record as a whole.

## II.   **Background**

Plaintiff was forty-seven years old when he applied for benefits and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. § 1563(c). He has a high school education.

### A.   **Plaintiff's Testimony**

Plaintiff testified at the hearing before ALJ Motta that he cannot work "because I can't breathe…. I'm on oxygen. I get short of breath. I can't do much of anything anymore." (Doc. #6, *PageID* #128). He uses an oxygen machine at home that produces its own oxygen, and he also has a "bigger emergency tank." *Id.* He uses the machine twenty-four hours per day when he is at home. *Id.* at 135. He also uses a nebulizer at least four times per day. *Id.* at 140. When Plaintiff gets short of breath, he sometimes feels weak and has anxiety attacks. *Id.* at 129-30. He has anxiety attacks a "few times a month." *Id.* at 139. He has not received treatment or medication for anxiety. *Id.* at 130, 139.

Plaintiff's primary-care physician is Dr. Bland. *Id.* at 130. He sees her "when she makes the appointments," and she prescribes albuterol. *Id.* In December 2012, he was hospitalized for a week due to breathing difficulties. *Id.* The hospital gave him patches to help him quit smoking, and he has not smoked since. *Id.* at 129.

Plaintiff testified that he was upset with his experience with the consultative examiner's pulmonary-function study.  *Id.* at 135.  He explained,

> The doctor that was there was at least 90 years old…. I repeatedly told the man doing the test that I was having problems breathing, and they let me pass out and hit my head on the wall. And… the old man didn't even acknowledge – I [came] to and picked myself back up off the floor. And the machine… that they took the test [] on looked like something out of the '60s with a paper, and it looked like an earthquake machine.

*Id.* at 136.  Plaintiff's attorney noted that the doctor did not mention that he passed out. *Id.* at 137.  The ALJ indicated that she would send him to a different doctor for a new pulmonary-function study.  *Id.*

Plaintiff last worked at Payless as a shoe packager from 2010 to 2011.  *Id.* at 125. He stopped working because, "I was having trouble breathing at the time and wasn't sure what was going on.  And they switched us to production, and I couldn't keep up."  *Id.* at 126.  When asked if he was fired or if he quit, he responded, "I clocked out and went home.  They said I walked off the job.  So that, in their eyes, they fired me…."  *Id.*  He previously watered plants and worked in the greenhouse at Springfield Nurseries.  *Id.*  He also worked on a production line at Lewisburg Container, and he did general labor at both Kelchner and Miller Brothers Excavating.  *Id.* at 127.

Plaintiff resides with his wife and two sons.  *Id.* at 124.  He used to be able to cook and prepare meals, but now he can only use the microwave.  *Id.* at 131.  He can stand and wash dishes at the sink for ten to fifteen minutes.  *Id.*  He also tries to help with laundry. *Id.*  He does not vacuum or work outside.  *Id.* at 131-32.  He is able to take a bath or shower and can dress himself.  *Id.* at 133.  He does not use a computer or a cell phone.

3

*Id.* Altogether, Plaintiff only helps with chores approximately one hour per day. *Id.* at 138. During the day, he watches TV, sits at the back window, reads books, and sometimes lies in bed all day. *Id.*

Plaintiff has a driver's license, but he does not drive because, "I don't like to drive and go anywhere by myself with the oxygen. Our car is not the best, and I'm just nervous about something breaking down and being by myself." *Id.* at 124. In general, he does not leave the house by himself. *Id.* at 139. He is embarrassed by the oxygen tank, and it makes him feel bad about himself. *Id.* Plaintiff does not generally go shopping. *Id.* at 132. However, he went grocery shopping with his wife a few weeks before the hearing. *Id.* He used to go hunting, but he has not gone in a couple years. *Id.* at 134. He also likes to fish. *Id.* The last time he went fishing, it was only for an hour. *Id.*

### B.    Medical Opinions

#### i.  Carol Bland, M.D.

Plaintiff's primary-care physician, Dr. Carol Bland, completed an assessment on December 3, 2012. *Id.* at 470-72. Dr. Bland opined that Plaintiff could stand for fifteen minutes at a time for a total of one hour in an eight-hour workday and sit for one hour at a time for a total of one hour in an eight-hour workday. *Id.* at 471. He cannot lift any weight. *Id.* He can never bend; stoop; work around dangerous equipment; tolerate heat or cold; or tolerate exposure to dust, smoke, or fumes. *Id.* He can occasionally balance, raise his arms above shoulder level, and operate a motor vehicle. *Id.* In addition, he can frequently engage in fine or gross manipulation with his hands and constantly tolerate noise exposure. *Id.* Dr. Bland further opined that his pain is mild, but he would

4

frequently miss work due to exacerbations of pain. *Id.* at 472. Specifically, he could have two to three episodes per year that could last for days or a couple weeks at a time. *Id.* She also noted that he "[r]equires oxygen." *Id.*

### ii. Damian Danopulos, M.D.

On October 8, 2012, Dr. Damian Danopulos performed a pulmonary-function study. *Id.* at 427-33. Dr. Danopulos concluded that Plaintiff had "[m]oderate degree obstructive and mild degree restrictive lung disease with mild [bronchodilator] effect, if at all." *Id.* at 429. He noted that Plaintiff tried his best, and the test was valid. *Id.* at 428-29.

### iii. Stephen Halmi, Psy.D.

Dr. Halmi examined Plaintiff on August 3, 2012. *Id.* at 417. He noted that Plaintiff drove to the appointment by himself but told him, "I have problems driving because of the oxygen tank." *Id.* at 420. He reported that he smokes three to four cigarettes per day. *Id.* at 419. Further, he is able to take care of his personal hygiene without assistance. *Id.* He completes light housework, including doing the dishes and vacuuming. *Id.*

Dr. Halmi diagnosed Plaintiff with Depressive Disorder and Anxiety Disorder. *Id.* at 422. He noted that he has not received any psychological treatment or medication. *Id.* at 419. He opined that he was capable of understanding, remembering, and carrying out simple and multi-step instructions. *Id.* at 424. However, he would not be capable of performing a multi-step task because he has concentration problems, low frustration tolerance, and a lack of initiative. *Id.* He would have intermittent problems responding

to supervision and coworkers, and he cannot effectively manage difficult people.  *Id.* at 424-25.

### iv.  Phillip Swedberg, M.D.

Dr. Phillip Swedberg examined Plaintiff on January 29, 2014.  Dr. Swedberg noted that he could not perform a pulmonary-function study because "patient is currently on treatment of steroids due to a lung infection."  *Id.* at 501.  However, a CT scan revealed hyperinflation of his lungs.  *Id.* at 488.  He diagnosed Plaintiff with COPD.  *Id.* at 487.  Dr. Swedberg also observed that his "breath sounds were distant and scattered rhonchi were noted."  *Id.*  Additionally, he coughed frequently throughout the exam.

Dr. Swedberg opined that Plaintiff can lift up to ten pounds frequently and twenty pounds occasionally and carry up to twenty pounds frequently.  *Id.* at 495.  He can sit for four hours at one time for a total of four hours in an eight-hour workday, he can stand for thirty minutes at one time for a total of three hours, and he can walk for thirty minutes at one time for a total of two hours.  *Id.* at 496.  He can frequently reach, feel, and push/pull with his hands.  *Id.* at 497.  In addition, he can frequently operate foot controls.  *Id.*  He can never climb stairs, ramps, ladders, or scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl.  *Id.* at 498.  He can occasionally be exposed to moving mechanical parts and operate a motor vehicle, and he can never be exposed to unprotected heights; humidity and wetness; dust, odors, fumes, and pulmonary irritants; extreme hot or cold; and vibrations.  *Id.* at 499.

### v. Babatunde Onamusi, M.D.

Dr. Babatunde Onamusi attempted to conduct a second pulmonary-function study on March 5, 2014. *Id.* at 505-06. The technician administering the test noted that Plaintiff was coughing, sweating, and wheezing at the time of the test. *Id.* at 505. In addition, the technician had to stop the test because the "[patient] couldn't tolerate." *Id.* Dr. Onamusi opined that the "study [was] probably not valid" and that there were "[n]onreproducible tracings." *Id.* at 506. However, his interpretation of the study was "very severe obstruction." *Id.*

### vi. Steve McKee, M.D. & Leanne Bertani, M.D.

On October 12, 2012, Dr. Steve McKee reviewed Plaintiff's records. *Id.* at 164-76. He opined that Plaintiff could occasionally lift and/or carry up to twenty pounds and could frequently lift and/or carry ten pounds. *Id.* at 170. He could stand and/or walk for a total of six hours in an eight-hour day and sit for a total of six hours in an eight-hour day. *Id.* at 170-71. He can never climb ladders, ropes, or scaffolds, occasionally crawl, and frequently climb ramps and stairs. *Id.* at 171. He should avoid even moderate exposure to extreme hot and cold and humidity; all exposure to fumes, odors, dusts, gases, poor ventilation, etc.; and all exposure to hazards such as machinery and heights. *Id.* at 171-72. Dr. McKee indicated that all of his restrictions were due to COPD. *Id.* He concluded that Plaintiff was not disabled. *Id.* at 175.

Dr. Leanne Bertani reviewed Plaintiff's records on December 10, 2012 and added a few more restrictions. *Id.* at 178-90. She opined Plaintiff could stand and/or walk for a total of four hours in an eight-hour day, for thirty minutes at a time. *Id.* at 185. He could

7

occasionally climb stairs and ramps and frequently stoop, kneel, crouch, and crawl.  *Id.*

He should avoid concentrated exposure to extreme hot and cold; humidity; fumes, odors,

dusts, gases, poor ventilation, etc.; and hazards such as machinery and heights.  *Id.* at

186.

## III.  **Standard of Review**

The Social Security Administration provides Disability Insurance Benefits to

individuals who are under a "disability," among other eligibility requirements.  *Bowen v.*

*City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1).  The term

"disability" – as defined by the Social Security Act – has specialized meaning of limited

scope.  It encompasses "any medically determinable physical or mental impairment" that

precludes an applicant from performing a significant paid job – i.e., "substantial gainful

activity," in Social Security lexicon.  42 U.S.C. § 423(d)(1)(A); *see Bowen,* 476 U.S. at

469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines:

"whether the ALJ applied the correct legal standards and whether the findings of the ALJ

are supported by substantial evidence."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399,

406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir.

2007).  Review for substantial evidence is not driven by whether the Court agrees or

disagrees with the ALJ's factual findings or by whether the administrative record

contains evidence contrary to those factual findings.  *Gentry v. Comm'r of Soc. Sec.*, 741

F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir.

2007).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard

is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance…." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry – reviewing the correctness of the ALJ's legal criteria – may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV.    The ALJ's Decision

As noted previously, it fell to ALJ Motta to evaluate the evidence connected to Plaintiff's application for benefits.  She did so by considering each of the five-sequential steps set forth in the Social Security Regulations.  *See* 20 C.F.R. § 404.1520.  She reached the following main conclusions:

Step 1:    Plaintiff has not engaged in substantial gainful employment since July 1, 2011.

Step 2:    He has the severe impairment of COPD.

Step 3:      He does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:      His residual functional capacity, or the most he could do in a work setting despite his impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of a "light work… except: lift up to 20 pounds occasionally and 10 pounds frequently; standing and walking limited to 30 minutes at a time for a combined total of four hours in an eight-hour workday; only occasional postural activities, such as climbing stairs/ramps, balancing, stooping, kneeling, crouching, or crawling; no climbing ropes, ladders, or scaffolds; no exposure to hazards, such as moving or dangerous machinery or working at unprotected heights; no concentrated exposure to odors, gases, dust, fumes, or poorly-ventilated areas; indoor, temperature-controlled environment with no exposure to extremes of cold, heat, wetness, or humidity; low stress work with no strict production quotas or fast pace, and few changes in the work setting, and; only occasional contact with the public, co-workers, and supervisors."

Step 4:      He is unable to perform any of his past relevant work.

Step 5:      He could perform a significant number of jobs that exist in the national economy.

(Doc. #6, *PageID* #s 100-12).  These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability.  *Id.* at 111.

## V.   <u>Discussion</u>

Plaintiff contends that the ALJ erred in rejecting Plaintiff's treating physician's opinions and finding that Plaintiff was not credible.  The Commissioner maintains that the ALJ properly weighed the medical opinions of record and substantial evidence supports the ALJ's finding that Plaintiff was not fully credible.

## A.    Medical Opinions

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions.  "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule."  *Rogers,* 486 F.3d at 242 (citations omitted).  The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors."  *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions.  *Wilson*, 378 F.3d at 544.  This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions."  *Id.* (quoting Soc. Sec. Rul. No. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)).  The goal is to make clear to

11

any subsequent reviewer the weight given and the reasons for that weight. *Id*. Substantial evidence must support the reasons provided by the ALJ. *Id*.

ALJ Motta does not say exactly how much weight she assigned Dr. Bland's opinions. Instead, she asserts, "Dr. Bland's opinion is not given controlling weight, although it was considered in limiting the claimant to a light range of work…." (Doc. #6, *PageID* #107). ALJ Motta's decision contains very little concerning the treating physician rule. She merely refers to "controlling weight" and indicates that she "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." *Id*. at 103. ALJ Motta did not explicitly address the two conditions under the treating physician rule. She does not even mention the second condition – whether the opinion is not inconsistent with the record. Similarly, she does not explicitly refer to the first condition – whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques – but she does criticize Dr. Bland's opinions for lacking support. However, it is unclear if she is addressing the first condition of the treating physician rule or supportability under the factors. It appears that she might be addressing supportability under the factors because her findings concerning support are intermingled with her discussion of the other factors.

There are several errors in the ALJ's analysis. First, the "factors are properly applied only *after* the ALJ has determined that a treating-source opinion will not be given controlling weight." *Gayheart,* 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)) (emphasis added). If at all, ALJ Motta addressed the treating physician rule at the same time as the factors. Second, the uncertainty of whether ALJ Motta addressed the

12

conditions of the treating physician rule conflicts with the requirement that the decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. No. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996). Third, by using the same standard to weigh treating physicians' opinions and other physicians' opinions, she fails to recognize the deference given to treating physicians' opinions. *Id.* at *4 ("In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.").

However, even if the ALJ was addressing the treating physician rule when she discussed support, her findings are not supported by substantial evidence. The ALJ found that Dr. Bland "largely relied on his allegations of severity of COPD without appropriate testing or knowledge of the pulmonary function study done at the request of the Administration." (Doc. #6, *PageID* #108). She noted that Dr. Bland "prescribed oxygen for the claimant at his initial or second visit to her based on the claimant's allegations that his breathing was worsening, although…, his pulse oximetry had improved to 96%, and wheezing was mild to moderate." *Id.* (citation omitted).

The ALJ's assertion that Dr. Bland "largely relied on his allegations of severity of COPD" is not supported by the record. Dr. Bland's opinions are supported by her treatment notes, Plaintiff's previous physician's notes, and hospital records. The ALJ fails to acknowledge that Dr. Bland had the benefit of access to Dr. Boggs' treatment notes, including some hospital records. For example, a radiology report from April 2010

revealed moderate hyperinflation of the lungs.  *Id.* at 413.  Dr. Boggs' notes reveal that between August 2011 and April 2012, Plaintiff consistently suffered from shortness of breath, coughing, and wheezing.  *Id.* at 401-10.

Plaintiff's hospital records also support Dr. Bland's opinions.  On August 17, 2011, he presented to the emergency room with shortness of breath.  *Id.* at 389.  Hospital records indicate "hyperinflated lungs on [chest x-ray] suggestive of COPD."  *Id.* at 390.  Further, he had bilateral rhonchi in bases and wheezing in bases.  *Id.*  Plaintiff followed up with Dr. Boggs on August 25, 2011, and he noted that he was still experiencing some wheezing and rhonchi in bases.  *Id.* at 410.  Plaintiff returned to the emergency room on March 19, 2012.  *Id.* at 366.  He reported coughing and shortness of breath.  *Id.* at 370.  Hospital records indicate that he was wheezing and had rhonchi, and he required five liters of oxygen.  *Id.* at 372.  In addition, they note that his shortness of breath "gets worse with exertion."  *Id.* at 368.  On March 23, 2012, he was discharged with oxygen and medication.  *Id.* at 366.  Plaintiff followed up with Dr. Boggs, who noted that he should use oxygen at all times for two weeks.  *Id.* at 403.

The ALJ is correct that there is no indication that Dr. Bland ever received a copy of the results of Dr. Danopulos' pulmonary-function study.  However, Plaintiff did notify her that he underwent testing by "a doctor in Kettering."  *Id.* at 467.  Dr. Bland noted that the results should be obtained or he should be re-tested, as the evaluation may have been incomplete due to him passing out.  *Id.*

In addition to addressing support, the ALJ weighed Dr. Bland's opinions under several other factors.  The ALJ emphasized that she only treated Plaintiff "a few times"

14

between September 2012 and December 2012 and then once in December 2013.  The

ALJ also notes that "Dr. Bland did not complete the GOLD classification for COPD on

the medical statement, and is not a pulmonary specialist."  *Id.* at 107.  Although this is

true, the ALJ fails to recognize that he had been treating with Lewisburg Family Practice,

where Dr. Bland practices, since at least August 2011.  *Id.* at 410.  Dr. Bland specifically

notes that she reviewed Plaintiff's history with him, in Dr. Boggs' paper chart, and in

Epic.  *Id.* at 444.  Notably, this includes radiology reports from his hospitalizations.  *Id.* at

411-13.

Further, the ALJ notes that although Dr. Bland referred Plaintiff to a specialist,

there is no indication he ever followed through with the referral.  However, the ALJ does

not recognize that Plaintiff had a good reason for not following up – he had an extremely

negative experience the first time he attempted to undergo pulmonary-function testing.

Specifically, he had trouble breathing, passed out, hit his head on the wall, and had to

pick himself up off the floor.  The physician performing the test did not even

acknowledge that it had happened.  Despite this, when the ALJ referred him to another

physician for pulmonary-function testing, he went, although he was ultimately unable to

complete the testing due to difficulty breathing.  It was therefore unreasonable for the

ALJ to place any significance on Plaintiff's lack of follow up with a specialist.

The ALJ also found that "[t]here is no documented evidence that he has been on

continuous supplemental oxygen for any prolonged period prescribed by Dr. Bland or

anyone else."  *Id.* at 108.  She explains that when he was hospitalized in March 2012, "he

was not on any regular treatments and smoking."  *Id.*  However, the ALJ is not entirely

correct. Plaintiff was "discharged with home O2" from the hospital in March 2012. *Id.* at 366. At his follow-up appointment, Dr. Boggs instructed him to "use O2 24/7 for *at least* 2 [weeks]." *Id.* at 403 (emphasis added). On October 10, 2012, Plaintiff reported to Dr. Bland that his breathing had been worse recently and he was coughing more. *Id.* at 444. Dr. Bland also noted "poor AE, pOx 96%, mild to moderate diffuse wheezes…." *Id.* Based on her review of his treatment records, her examination of him, and his reports, she prescribed continuous oxygen. *Id.* at 443. On October 31, 2012, Dr. Bland noted that he did not bring his oxygen with him, and he said that he could sometimes go without depending on what he was doing.[2] *Id.* at 463. But, he also told her that he uses his oxygen when he is home. *Id.* By December 2012, Plaintiff was "on 3L O2 for most hours of the day." *Id.* at 466. Dr. Bland also noted "course breath sounds, bilaterally. Inspiratory wheezes in all lung fields. Expirator wheezes [right lower lung], [left lower lung]." *Id.* Although Plaintiff did not bring his oxygen to the appointment, Dr. Bland instructed him to "continue 3L O2." *Id.* at 467. Finally, in March 2014, Dr. Onamusi noted that Plaintiff was currently using oxygen. *Id.* at 505. Together, this shows that between March 2012 and March 2014, Dr. Bland consistently prescribed oxygen, and Plaintiff consistently reported using oxygen. Substantial evidence does not support the ALJ's contrary findings.

---

[2] Although the ALJ comments on Plaintiff's "large, old-appearing oxygen tank that he rolled or dragged into the hearing room," she does not consider that he may have difficulty rolling or dragging it into his doctor's office. In addition, Plaintiff testified that he does not like to go in public because he is embarrassed to carry around the oxygen tank, and it makes him feel bad about himself. (Doc. #6, *PageID* #139).

In comparison to the limited weight ALJ Motta gave to Dr. Bland's opinions, she gave consultative examiner Dr. Swedberg's opinions significant weight because they were "generally consistent with the overall evidence of record and his clinical findings on examination." *Id.* at 108. Specifically, Dr. Swedberg noted that the pulmonary-function testing was consistent with moderate COPD and Plaintiff's last hospitalization for shortness of breath was two years earlier. *Id.* The ALJ erred by failing to apply the same level of scrutiny to the consultative physician's opinion as she applied to treating source's opinion. *See Gayheart,* 710 F.3d at 379 (citing 20 C.F.R. § 404.1527(c); Soc. Sec. R. 96-6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996)) ("A more rigorous scrutiny of the treating-source opinion than the nontreating and nonexamining opinions is precisely the inverse of the analysis that the regulation requires."). For example, the ALJ criticizes Dr. Bland's opinions because she is not a pulmonary specialist but fails to acknowledge that Dr. Swedberg is not a pulmonary specialist either. Similarly, she criticizes Dr. Bland for not completing the GOLD classification for COPD but fails to mention that Dr. Swedberg did not complete the GOLD classification either. Finally, the ALJ gives Dr. Bland's opinions less weight because she only treated Plaintiff a few times, but she does not acknowledge that Dr. Swedberg only met with him once.

The ALJ's asserts that "Dr. Swedberg noted that pulmonary function testing was consistent with moderate COPD." (Doc. #6, *PageID* #108). However, Dr. Swedberg only noted that in his history. Dr. Swedberg was not able to complete a pulmonary-function study because Plaintiff was taking steroids for the treatment of a lung infection. *Id.* at 494. Only Dr. Danopulos and Dr. Onamusi performed pulmonary-function testing.

First, on October 8, 2012, Dr. Danopulos found moderate degree obstruction and mild degree restrictive lung disease. *Id.* at 429. He noted that Plaintiff "tried his best" and "was experiencing [shortness of breath] after each attempt. *Id.* at 428. Then, on March 6, 2014, Dr. Onamusi attempted to perform the test but "stopped [the] test because [the patient] couldn't tolerate." *Id.* at 505. He noted that Plaintiff was coughing, sweating, and wheezing. *Id.* Dr. Onamusi opined that the test results revealed a "very severe obstruction," but the "study was probably not valid" and resulted in "[n]onreproducible tracings." *Id.* at 506.

Similarly, ALJ Motta gave the opinions of the State agency record-reviewing physicians significant weight. *Id.* at 108. She found their opinions to be consistent with the overall evidence of record. *Id.* (citation omitted). Specifically, the State agency physicians found that "the record established COPD as the claimant's sole physical impairment, and that the longitudinal record showed improvement over time…." *Id.* at 108-09. They further noted that he is able to do household chores and has an active driver's license that he uses. *Id.* at 109. Although Plaintiff claimed that he could not walk for more than five minutes without oxygen, he sometimes went to doctor appointments without it and told the doctor that he could go without it at times. *Id.* Thus, the ALJ concluded that the "evidence noted by the state agency is consistent with their opinion that the claimant could sustain light work activity with additional limitations." *Id.*

Again, ALJ Motta failed to apply the same level of scrutiny to the record-reviewing physicians as she applied to Plaintiff's treating physician. She does not

acknowledge that the State agency physicians are not pulmonary specialists, and they did not complete a GOLD classification for COPD.  Additionally, although the ALJ states that "the longitudinal record showed improvement over time," Dr. Bertani's opinion is more restrictive than Dr. McKee's opinion.  For example, Dr. McKee opined that Plaintiff can stand and/or walk for a total of six hours in an eight-hour day, but Dr. Bertani found that Plaintiff could only stand and/or walk for four hours.  Additionally, Dr. McKee found that Plaintiff's ability to stoop, kneel, and crouch were unlimited, but Dr. Bertani concluded that he could only do those activities frequently.  If Plaintiff's condition improved over time, it would be expected that Plaintiff would have less restrictions, not more.  However, in some cases, Dr. McKee's opinions were more restrictive.  For example, Dr. Bertani opined that Plaintiff must avoid concentrated exposure to cold, heat, and humidity, but Dr. McKee determined that Plaintiff should avoid even moderate exposure.  The reason for these differences is not clear.  Finally, the ALJ does not acknowledge that the State agency physicians reviewed Plaintiff's records in October and December 2012, long before the ALJ's decision in May 2014.

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[3]

## B.    Remand

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that

---

[3] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's challenge to the ALJ's assessment of his credibility is unwarranted.

shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff to lack credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is weak. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is weak. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of §405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal

20

criteria mandated by the Commissioner's Regulations and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether his application for Disability Insurance Benefits should be granted.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability finding be vacated;

2. No finding be made as to whether Plaintiff Donald Dehart was under a "disability" within the meaning of the Social Security Act;

3. This matter be **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Report and Recommendations, and any decision adopting this Report and Recommendations; and

4. The case be terminated on the Court's docket.

Date: November 15, 2016        *s/Sharon L. Ovington*
                                             Sharon L. Ovington
                                             Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days if this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).